**IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**In re: MARK EASTBURN, Debtor**                    **No. 5:24-bk-70526**
                                                              **Chapter 7**


**J. BRIAN FERGUSON, Trustee**                        **PLAINTIFF**



**v.**                              **5:24-ap-07039**



**KIRA HERNANDEZ & MARK EASTBURN**          **DEFENDANTS**


**ORDER AND OPINION DENYING RELIEF**

On March 29, 2024, Mark Eastburn [Eastburn or debtor] filed a voluntary chapter 7 bankruptcy case. On June 25, 2024, chapter 7 trustee J. Brian Ferguson [trustee] filed a *Complaint to Set Aside Fraudulent Transfers; to Set Aside Deed for Undue Influence; for Authority to Sell Co-Owned Real Property Free and Clear of Claims and Interest; and for Other Relief* against separate defendants Eastburn and Kira Hernandez [Hernandez]. On July 24, 2024, Hernandez filed an answer to the complaint through her counsel. Pro se defendant Eastburn did not file an answer or otherwise respond to the complaint. On January 30, 2025, after obtaining leave from the Court, the trustee filed an amended complaint in which he alleged that the doctrine of mutual mistake provided an additional basis to set aside the deed in question. On February 15, 2025, Hernandez filed her answer to the amended complaint.

On February 6, 2025, the trustee filed his *Trustee's Motion for Partial Summary Judgment* with a supporting brief and statement of undisputed material facts; on February 25, Hernandez filed her response to the summary judgment motion, and two days later, filed her supporting brief; on March 13, the trustee filed a reply; on March 15, Hernandez filed a response to the trustee's statement of undisputed material facts. On May 29, the Court entered its *Order Granting In Part and Denying In Part Motion for Partial Summary Judgment and Establishing Facts Not In Dispute Pursuant to Federal Rule of*

*Civil Procedure 56(G)* [Summary Judgment Order].  Although the trustee requested summary judgment on most of his claims and several issues of fact, the Court granted summary judgment on only three issues of fact as set out below and denied the remainder of the trustee's motion.

On April 2, 2026, the Court held a trial on the amended complaint and answer.  Vanessa Cash Adams and Anh-Thu Cecille Doan appeared on behalf of Hernandez.  James R. Baxter appeared on behalf of the trustee.  Hernandez also appeared and testified at length. Eastburn currently lives in Costa Rica and did not appear.  Although Eastburn was reportedly willing to testify by video or telephone, the parties agreed to admit into evidence the complete transcript of Eastburn's January 27, 2025 deposition testimony in lieu of calling him as a witness at trial.  At the outset of the trial, counsel for the trustee announced that the trustee was no longer pursuing the fraudulent transfer cause of action stated in his complaint and had agreed to dismiss separate defendant Mark Eastburn from the proceeding.

At the conclusion of the trial, the Court took the matter under advisement.  Based upon the Court's record from the April 2 trial, the Court's assessment of the credibility of the witnesses, the Court's Summary Judgment Order, and the following findings of fact and conclusions of law, the Court finds that the trustee did not meet his burden of proving that the subject quitclaim deed, more specifically described below, should be set aside under any of the trustee's remaining causes of action.  This holding moots the trustee's request to sell a co-owner's interest under 11 U.S.C. § 363(h).  Additionally, this ruling renders Hernandez's motion for judgment on partial findings moot.

### I.      Jurisdiction

This Court has jurisdiction over this matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157. Certain claims are core proceedings under 28 U.S.C. § 157(b)(2)(E), (H), and (N).  Other claims are non-core, and the parties consented on the record at the April 2 trial to this Court entering a final order on the non-core claims.  *See* 28 U.S.C. § 157(c).  Therefore,

the following order constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## II.     Background and Issues

This adversary proceeding involves the debtor's pre-petition transfer of his interest in real property located at 1362 Middle Fork Road, Elkins, Arkansas [Elkins Property] to Hernandez. The debtor and Hernandez initially became acquainted in August 2020, when the debtor was a customer at a club where Hernandez worked.  When the debtor first became friends with Hernandez, he was in a romantic relationship with a woman in North Carolina, Holly George [George], whom he intended to marry.  Hernandez also had a romantic partner at that time.  The debtor and Hernandez's relationship had normal markings of a friendship.  For example, the debtor would have dinner with Hernandez and her family; Hernandez would give the debtor rides, including to the dentist and the airport; Hernandez and her boyfriend helped the debtor chop firewood, and the debtor would do certain "fixer-upper" tasks for Hernandez.  Over time, the debtor and Hernandez became very close friends, though at no time was their relationship romantic.

Around April 2021, the debtor expressed that he wanted to buy a home for Hernandez where she and her children could live.  Hernandez testified that the purchase was the debtor's idea, which the debtor did not contradict in his deposition.  However, the debtor did elaborate on his intention, testifying in his deposition that "[m]y intention was to get them into a house and stop putting money into this dumpy little duplex and give me that payment towards the house, the same thing they were paying for the rent on the duplex, and no interest."  (Pl.'s Ex. 8, Eastburn Dep. 16, Jan. 27, 2025.)  The debtor claimed they put this payment arrangement in writing but said that he destroyed it.  (Eastburn Dep. 25, 34.)  Hernandez adamantly disputed that the debtor expected her to make payments to him for the Elkins Property.  She testified that the debtor was aware of her financial situation when he purchased the home for her.  She had one job at the time, but later had to take on a second one, and she was not receiving any child support for her two children.

Hernandez and the debtor subsequently looked at two houses, including the Elkins Property. According to the testimony of the debtor's realtor, Shelcey Corbin [Corbin], the debtor and Hernandez visited the Elkins Property three times. Corbin testified that the debtor and Hernandez appeared to be friends and at no time did Corbin recall the debtor indicating he did not want to buy the property. She also testified that neither party appeared to be taking advantage of the other, and she did not recall the debtor ever requesting to cancel the contract for sale after he entered into it.

On June 8, 2021, the debtor paid $170,000 in cash for the Elkins Property. The debtor and Hernandez took title to the property as joint tenants with the right of survivorship.[1] However, according to Hernandez, the Elkins Property was always intended to be a home for Hernandez and her children and the debtor never expressed an intent to live there. Nothing in the debtor's deposition contradicted Hernandez's understanding in this regard.

Within a month of the purchase, Hernandez told the debtor that she was concerned that she would have to fight the debtor's estranged son to retain the Elkins Property if something were to happen to the debtor. Neither she nor the debtor knew what "right of survivorship" on the deed meant. Hernandez testified that, in order to address this concern, one day when the debtor was with her, she called the title company they had used for the closing because they both wanted to know if title could be placed in Hernandez's name only. The title company advised her that they needed a quitclaim deed. Hernandez contacted attorney Paul Reynolds [Reynolds], whom she had used in the past, and asked him to draft a quitclaim deed. He drafted the deed at no charge. Reynolds and the debtor never spoke. Hernandez collected the deed from Reynolds and took it to the debtor to sign. Two days later, Hernandez took the deed to be recorded.

---

[1] The debtor's purchase of the property for Hernandez was initially alleged by the trustee to be a fraudulent transfer for lack of consideration; however, that cause of action has been withdrawn.

4

The quitclaim deed transferred all of the debtor's interest in the Elkins Property to Hernandez.[2]

Although it is undisputed that the debtor signed the quitclaim deed on July 20, 2021, Hernandez and the debtor had different recollections regarding the circumstances surrounding his execution of the deed.  Hernandez testified that she and the debtor drove separately to a UPS location where the debtor signed the deed in the presence of a notary.  She testified that the debtor's demeanor was fine and normal when he signed the deed.  The debtor recalled that Hernandez brought the deed to his home, where, without a notary present, she pressured him into signing the deed while he cried.  (Eastburn Dep. 29-31.)  The debtor testified that he was emotionally unwell when he signed the deed and would not have signed it had he been in his right state of mind.  (Eastburn Dep. 32.)

However, he also testified that he signed the quitclaim deed as an estate-planning tool to protect Hernandez and ensure she got the house if something happened to him. (Eastburn Dep. 32.)  He said that he would not have signed the deed had he realized that the original deed titling the property in both of their names as joint tenants with the right of survivorship had already accomplished this purpose.  (Eastburn Dep. 32.)  Hernandez agreed in her deposition that the quitclaim deed turned out to be unnecessary to protect her in the event of his death based on the wording of the original deed.  Based on that testimony, the Court previously made three findings on summary judgment: (1) the debtor and Hernandez did not realize that if the debtor died, the property would automatically go to Hernandez under the original deed because they owned the property as joint tenants with the right of survivorship; (2) there was no need for the quitclaim deed in light of the fact that he and Hernandez owned the property as joint tenants; and, (3) the debtor would not have signed the quitclaim deed but for his mistaken belief that it was necessary to ensure the property went to Hernandez if something were to happen to him.

---

[2]  The debtor's transfer of his interest in the Elkins Property by quitclaim deed to Hernandez is the transfer that the trustee seeks to set aside.

The Elkins Property was not the first home the debtor had purchased for someone in his life.  In the fall after his wife's death in April 2020, the debtor purchased a home in North Carolina for his then-girlfriend George, with the expectation that he would live there with her in the future.  (Eastburn Dep. 5.)   However, the relationship ended shortly after he purchased the home for George.  At that time, the debtor saw a psychiatric nurse and began taking anxiety medication.  (Eastburn Dep. 26, 36-37.)  The debtor testified at his deposition that he remained on anxiety medication when he signed the quitclaim deed transferring his interest in the Elkins Property to Hernandez.  (Eastburn Dep. 36.)  Nonetheless, the debtor testified that he knew what he was signing when he executed the quitclaim deed.  (Eastburn Dep. 17.)  The debtor testified that Hernandez did not force him to buy the home for her but that she did influence him when he was vulnerable.  (Eastburn Dep. 17-18.)  He testified that he regretted signing the deed the day after he did it.  (Eastburn Dep. 31.)

According to both Hernandez and the debtor, the two remained friends after she moved into the home.  The debtor testified that after he bought Hernandez the home, he went on a canoe trip with her and her extended family and ate dinner with her and her children "most of the time."  (Eastburn Dep. 20.)  The debtor also recalled spending the night at Hernandez's home before one of his three trips to Costa Rica so she could take him to the airport the following day.  (Eastburn Dep. 45.)

However, in or around August 2021, the debtor ended their friendship.  At the time, the debtor was dating a woman from the Philippines named Cath.  According to Hernandez, the debtor told her that he was no longer allowed to speak to her because Cath did not understand their friendship.  Also in August 2021, the debtor presented Hernandez with a promissory note and mortgage on the Elkins Property and asked her to sign the documents.  (Pl.'s Exs. 4 & 5.)  Hernandez testified that she did not refuse to sign the documents because the debtor changed his mind and told her to give them back.[3]  The

---

[3]  When counsel for the trustee asked Hernandez whether she would have signed the documents had the debtor not asked her to give them back, she responded that she would have signed them if she and the debtor had originally agreed that she would make

debtor also changed his mind about ending his friendship with Hernandez, saying Cath would have to understand.  The debtor went to Hernandez's home and left flowers on her porch, along with toys for her children and a letter in which he told Hernandez he loved her.  Hernandez said the debtor knew a romantic relationship would never happen but she slowly resumed her friendship with him, despite being wary of what to expect. The debtor and Cath subsequently broke up, and he began dating Nemesis from Costa Rica. Nemesis and the debtor subsequently broke up, but the debtor became engaged to another person in the Costa Rica, and he now lives there permanently.

At some point, the debtor and Hernandez stopped communicating altogether.  On December 26, 2023, Hernandez received a letter from the debtor's attorney, Jodie Kelley [Kelley], who had set up his trust, requesting that Hernandez sign a note and mortgage on the Elkins Property or he would take legal action.  Hernandez did not sign the documents. The debtor filed bankruptcy on March 29, 2024.

The trustee filed this adversary proceeding on June 25, 2024. The trustee seeks to set aside the transfer of the debtor's interest in the Elkins Property to Hernandez via the quitclaim deed because (i) Hernandez was unjustly enriched by the transfer; (ii) the debtor executed the quitclaim deed as a result of undue influence that Hernandez exerted upon him; (iii) the debtor lacked the mental capacity to execute the deed; and (iv) to the deed was executed due to a mutual mistake arising from the debtor and Hernandez not realizing that the quitclaim deed was unnecessary based on the wording of the original deed.

The trustee also makes two preliminary arguments regarding the burden of proof and a rebuttable presumption.  First, he argues that the quitclaim deed was testamentary in nature, and therefore, as the procurer of the deed, Hernandez has the burden to prove beyond a reasonable doubt that the debtor was free from undue influence and had the necessary mental capacity to execute the quitclaim deed.  Second, the trustee argues that

---

payments on the house but, because they did not, she would not have signed the documents in August 2021.

because Hernandez procured the deed, a rebuttable presumption of undue influence and lack of mental capacity arises.  Although the trustee contends that the debtor and Hernandez were in a confidential relationship when the quitclaim deed was executed, the trustee argues that only procurement—not procurement plus a confidential relationship— is required to give rise to the rebuttable presumption.  The Court will first address these preliminary issues and then analyze whether the transfer may be set aside for a lack of mental capacity and undue influence, mutual mistake, and unjust enrichment.

### III.    Preliminary Issues Affecting Burdens of Proof and Applicability of Rebuttable Presumption

#### A. The Quitclaim Deed Was Not Testamentary but Effectuated an Inter Vivos Gift to Hernandez

The trustee argued at trial, as he alleged in his summary judgment motion, that the quitclaim deed had a testamentary purpose and was part of the debtor's testamentary plan.  *See Stanley v. Burchett*, 216 S.W.3d 615 (Ark. Ct. App. 2005); *see also Plumley v. Plumley*, No. CA 08-3, 2008 WL 2444799, at *5 (Ark. Ct. App. June 18, 2008) ("[w]hen a deed is part of a testamentary plan, as here, one who procures the deed bears the burden of proving that the grantor had the necessary mental capacity and freedom from undue influence").

The Court disagrees that the quitclaim deed was testamentary.  Although it was executed because of Hernandez's concern that she would have to fight the debtor's son to retain the property in the event of the debtor's death, the quitclaim deed itself conveyed, and was intended to convey, a present interest in the property.  *See Parkey v. Baker*, 492 S.W.2d 891, 892 (Ark. 1973) (quoting *Ferguson v. Haynes,* 273 S.W.2d 23 (Ark. 1954) ("a deed is a present grant rather than a mere promise to be performed in the future . . ."); *see also Estate of McKasson v. Hamric,* 20 S.W.3d 446, 448 (Ark. Ct. App. 2000) (finding that although a debt was to be extinguished upon the grantor's death, the deed itself conveyed a present interest in the property and the lower court should not have found the deed to be a will).

There is sufficient evidence of this intent.  First, the language of the deed itself conveys a present interest in property.  (Pl.'s Ex. 2.)  Second, the debtor had a trust that was

8

testamentary in nature and there is no evidence that the debtor intended for the Elkins Property to be part of the trust. And third, the debtor testified at his deposition that the day after he signed the quitclaim deed, he regretted it because he "just signed away any right to that home." (Eastburn Dep. 31.) Further, there was no evidence that the debtor thought the conveyance would only take effect upon his death. Therefore, the debtor's intent was to make an inter vivos gift and keep the house *out* of his testamentary plan in order to spare Hernandez any future litigation with his estranged son.

Arkansas courts have found deeds to be testamentary in nature but on different facts than presented here. *See Stanley v. Burchett*, 216 S.W.3d 615, 619 (Ark. Ct. App. 2005). For instance, in *Stanley*, the grantor had terminal cancer and executed a new will that had different terms than his previous will. He also executed deeds that mirrored the provisions in his will. The court noted there was testimony that the grantor wanted the deeds prepared to avoid the time and expense of probate. In this case, the debtor's testamentary plan—his trust— was separate from his inter vivos gift to Hernandez, and the trustee recognized in his testimony that the debtor could have put the Elkins Property in that trust. Although the debtor testified in is deposition that the quitclaim deed was an "estate planning tool," it was so only in the sense that the debtor used the quitclaim deed to ensure that his gift to Hernandez would not be affected should he die. That purpose does not render the quitclaim deed testamentary in nature for purposes of shifting and increasing the burden of proof. Further, the debtor has taken the position, though it is not a position the Court finds credible, that he expected Hernandez to make payments to him for the Elkins Property. This position is further proof that the transaction was not testamentary but rather intended to provide him with supplemental income while he was alive. Because the deed is not testamentary, the Court declines to place a burden on Hernandez to prove beyond a reasonable doubt the debtor's mental capacity and freedom from undue influence.

### B. A Rebuttable Presumption of Undue Influence or Lack of Mental Capacity Does Not Arise

As the party seeking to set aside a deed, the trustee has the "burden of proving by a preponderance of the evidence that the grantor of the deed lacked mental capacity at the time the deed was executed or that the grantor acted under undue influence." *Montigue v.*

9

*Jones*, 576 S.W.3d 46, 56–57 (Ark. Ct. App. 2019) (citing *Hamric*, 20 S.W.3d at 449). However, there is a rebuttable presumption that arises of "undue influence or lack of mental capacity [that] arises . . . upon a showing that the grantee procured the deed while in a confidential relationship with the grantor." *Id.* (citing *Hamric*, 20 S.W.3d at 449 and *Myrick v. Myrick*, 2 S.W.3d 60, 64 (Ark. 1999)). When the presumption arises, "the grantee must go forward with evidence that the grantor possessed both the required mental capacity and freedom of will." *Id.* (citing *Hamric*, 20 S.W.3d at 448).

In his pre-trial brief and at trial, counsel for the trustee essentially argued that *Montigue* is not an accurate representation of Arkansas precedent, contending that only procurement is necessary to shift burden of proof to Hernandez. Again, the Court disagrees. The cases cited by the trustee deal with testamentary dispositions. As the Arkansas Court of Appeals stated in *Hamric*,

> [i]t simply cannot be the law that in an ordinary deed transaction the grantee bears the burden of proving the grantor's mental capacity and his freedom from undue influence merely because the grantee has caused the deed to be prepared. It is true that in certain circumstances a presumption of undue influence may arise in connection with the execution of a deed.

*Hamric*, 20 S.W.3d at 449. In support of the last statement, the *Hamric* court cited to *Myrick*, a case in which the Arkansas Supreme Court recognized that a confidential relationship must first be established before applying a presumption that a transfer of property is invalid due to coercion or undue influence, specifically stating that "once one spouse has shown that a confidential relationship existed with the other, and that the other was the dominant party in the relationship, it is presumed that a transfer of property from the former to the latter was invalid due to coercion and undue influence." *Myrick*, 2 S.W.3d at 64.

The holding in *Montigue* is consistent with the Arkansas case law stated above. Further, the Court is unaware of any Arkansas case in which a court expressly found that procurement is the only element required for the presumption to arise in the context of an inter vivos deed. Therefore, the final preliminary question before the Court is whether Hernandez both procured the deed and had a confidential relationship with the debtor

10

such that a rebuttable presumption of undue influence and lack of mental capacity is applicable in this case.

### 1. Hernandez Did Not Procure the Deed

Procurement "originally meant that the grantee of a deed wrote the instrument himself, [but it has been] has been extended to situations in which the grantee caused the deed to be prepared and participated in its execution." *Montigue*, 576 S.W.3d at 57 (citing *Hamric*, 20 S.W.3d at 448.)  However, the Arkansas Supreme Court has held that a beneficiary did not procure favorable terms under a will when he drove the testator to the attorney's office and participated in the initial will-drafting discussion. *Rose v Dunn*, 679 S.W.2d 180, 183 (Ark. 1984).  And, the Arkansas Court of Appeals has found no procurement when a beneficiary acted as a "mere courier or messenger" between the preparer of a deed and the grantor. *See Stanley*, 216 S.W.3d at 619.

Hernandez does not dispute that she did the legwork related to the quitclaim deed—she contacted her attorney about drafting it, picked it up from his office, took it to the debtor so that he could sign it, and then had it recorded.  All of these facts in isolation support procurement.  However, the Court finds that the weight of the evidence does not support a finding that these actions equate to procurement; rather, the evidence reflects that only after she and the debtor had a discussion about Hernandez's concern that she would be forced to fight the debtor's estranged son to keep her home should the debtor die, she called the title company in the debtor's presence, and in accordance with the advice she was given—and with the debtor's clear approval and agreement as evidenced by the text messages— she acted as a messenger and courier, making the calls and running the errands necessary to carry out her and the debtor's joint objective of obtaining, executing, and recording the quitclaim deed.  The deed was not in any way a surprise to the debtor; the deed carried out both parties' expressed wishes and did not vary from those.

While there was some questioning at trial concerning whether Hernandez was the debtor's power of attorney, the debtor's deposition contained no testimony about a power of attorney, no power of attorney was introduced into evidence, and Hernandez testified that she had been unaware it had existed until the debtor informed her that he had revoked it.  Further, even if the debtor did make Hernandez his power of attorney for

11

some unspecified period of time, the trustee has not alleged that Hernandez actually exercised, or even attempted to exercise, a power of attorney in relation to the quitclaim deed or any other matter.

### 2.  There was No Confidential Relationship

Even if the Court had found that Hernandez procured the deed under Arkansas law, the Court would also have to find that she had a confidential relationship with the debtor in order for the presumption to arise.  According to *Montigue*,

> "[t]here is no set formula by which the existence of a confidential relationship may be determined, for each case is factually different[.]" *Lucas v. Grant*, 61 Ark. App. 29, 34, 962 S.W.2d 388, 390 (1998).  A confidential relationship is not established simply because parties are related, *Wesley v. Estate of Bosley*, 81 Ark. App. 468, 475, 105 S.W.3d 389, 394 (2003), but other factors, such as a showing of special trust and dependence, may combine with a familial connection to create a confidential relationship. In particular, a confidential relationship may arise "between a person who holds power of attorney and the grantor of that power." *Medlock v. Mitchell*, 95 Ark. App. 132, 136, 234 S.W.3d 901, 905 (2006).

*Montigue*, 576 S.W.3d at 57.

Here, the debtor and Hernandez were close friends, but they are not related and their relationship was platonic.  There was also no "special trust" or similar device that might have given rise to a confidential relationship.  While the debtor asked Hernandez at one point if she wanted to be named on his bank accounts, Hernandez told the debtor she did not feel comfortable having access to his bank accounts and declined his offer.  As discussed above, the debtor allegedly made Hernandez his power of attorney, but no such document is in evidence.  Because the power of attorney was not introduced into evidence and the debtor's deposition contains no testimony on the subject, the Court cannot say with any degree of certainty that the power of attorney even existed, let alone rely on it as a basis to find that the debtor and Hernandez were in a confidential relationship.

Further, the debtor did not depend on Hernandez. While Hernandez helped him out, it was not because of any physical or other dependency.  While the debtor testified that his

friendship with Hernandez was the closest relationship he had at the time, his subjective feelings about Hernandez do not indicate dependence nor the existence of a "special trust" between them. Because the Court finds the record does not support a confidential relationship, no rebuttable presumption arises and the burden remains on the trustee to prove by a preponderance of the evidence that the debtor lacked mental capacity or was subjected to undue influence. With the burden of proof and lack of rebuttable presumption issues resolved, the Court turns to the four bases upon which the trustee seeks to set aside the quitclaim deed: lack of mental capacity, undue influence, mutual mistake, and unjust enrichment.

### IV.    Trustee Failed to Prove Any Basis to Set Aside the Quitclaim Deed

#### A. The Debtor Did Not Lack the Mental Capacity to Execute the Quitclaim Deed and Hernandez Did Not Exert Undue Influence Over the Debtor

The facts that relate to undue influence and mental capacity overlap, and the Court will consider these together. *Bennett v. Ballow*, 653 S.W.3d 357, 371 (Ark. Ct. App. 2022) (stating that "the questions of undue influence and mental incapacity . . . can be considered together."); *Phillips v. Jones*, 18 S.W.2d 352, 353 (Ark. 1929) (acknowledging that the questions of undue influence and testamentary capacity are so closely interwoven that they are "necessarily considered together.")

Under Arkansas law, the "mental capacity of the maker of a trust or deed is presumed, and the burden rests on the contestants to prove incapacity by a preponderance of the evidence." *Rose*, 679 S.W.2d at 183 (citing *Union Nat'l Bank of Little Rock v. Smith*, 400 S.W.2d 652 (Ark. 1966) and *Gibson v. Gibson*, 246 S.W. 845 (Ark. 1923)). "The law regarding mental capacity in the execution of a will is also applicable to the execution of a deed." *Id.* at 182. "Complete sanity in the medical sense is not required if the power to think rationally existed at the time the will was made." *Noland v. Noland*, 956 S.W.2d 173, 176 (Ark. 1997) (citations omitted). Mental capacity is examined at the time the document is executed. *Id.* However, evidence regarding a grantor's mental condition before and after the time the document was executed is relevant. *See id.* (discussing proof relevant to determining a testator's mental condition at time will was executed).

13

Here, the debtor executed the quitclaim deed on July 20, 2021. Three medical records regarding his mental condition before and after the date he executed the deed were admitted into evidence. (Pl.'s Ex. 3.) Two records—one dated February 12, 2021, and the other dated May 6, 2021—speak to the debtor's mental condition prior to the date he executed the deed. The third record, dated August 5, 2021, contains evidence of his mental condition after the date he executed the deed. Although all three records reflect diagnoses of depression and anxiety, the records affirmatively state that the debtor had no serious mental status abnormalities and exhibited no signs of cognitive difficulty. (Pl.'s Ex. 3.) The August 5, 2021 record is arguably the most instructive of the three records, as it reflects the debtor's mental condition only sixteen days after he executed the quitclaim deed. The August 5 record states that the debtor has no serious mental status abnormalities, no signs of cognitive difficulty, no signs of anxiety, and his judgment and insight appeared intact. (Pl.'s Ex. 3.) In addition, the debtor testified he has never been diagnosed with any cognitive impairment and that knew what he was signing when he executed the quitclaim deed. (Eastburn Dep. 17.)

Based on the Court's record, it does appear that the debtor has a history of questionable decision-making at the intersection of his personal and financial life. Relatively soon after his wife of forty years died, the debtor gifted houses to two women, one a romantic partner (George) and the other a close friend (Hernandez). There was also some testimony by Hernandez that he entered into relationships with women online and hired escorts. While Hernandez did not judge the propriety of his actions, she admitted that aspects of his decisions were concerning. The trustee testified that the debtor was spending money very quickly after his wife's death.

Even if some of the debtor's decisions following his wife's death were ill-advised, it does not automatically follow that the debtor lacked the cognitive ability to make them. The Court notes that the debtor was not unavailable to testify at the trial due to some sort of mental incapacity. He was unavailable to testify in person because he currently lives in Costa Rica and, at least as of the date of his deposition, he was engaged to be married. While it is likely the debtor was lonely, depressed, anxious, and as a result, prone to making grand gestures in new relationships, neither his medical records nor his actions

14

support a finding by a preponderance of the evidence that the debtor lacked the mental capacity to execute the quitclaim deed in 2021.

Likewise, the Court cannot find that Hernandez exercised undue influence over the debtor that caused him to quitclaim his interest in the Elkins Property to her. "Undue influence may be inferred from the facts and circumstances of the case." *Hooten v. Jensen,* 227 S.W.3d 431, 435 (Ark. Ct. App. 2006). The "influence that the law condemns is not the legitimate influence that springs from natural affection, but the malign influence that results from fear, coercion, or any other cause that deprives the individual of his free agency." *Bennett,* 653 S.W.3d at 371–72 (citation omitted). In addition, Arkansas courts have "long held that, with respect to a will obtained by influence, it is not unlawful for a person, by honest intercession and persuasion, to procure a will in favor of himself, or another person." *Pyle v. Sayers*, 39 S.W.3d 774, 779 (Ark. 2001) (citing *McDaniel v. Crosby*, 19 Ark. 533 (1858)). "Cases involving undue influence will frequently depend on the credibility of witnesses . . . ." *Id.*

Trustee's counsel stated in his opening that the "debtor suffered from a series of financial decisions brought about by women." Counsel's framing portrays the debtor as totally passive. The record does not support this suggestion. Hernandez testified that it was the debtor's idea to buy her a house. This is uncontroverted. The debtor testified Hernandez influenced him but did not force him to buy the home for her. (Eastburn Dep. 17-18.) Specifically, he said that Hernandez knew he was vulnerable and "guilt-tripped" him into rescinding a cancellation of the contract for sale. (Eastburn Dep. 18-19.) There is no evidence corroborating the debtor's recollection that he attempted to cancel the contract—the realtor did not remember any cancellation request and no written cancellation request was introduced at trial.

Based on the record, the debtor's gift to Hernandez, though subsequently a source of regret, sprung from his affection for her and the parties' friendship. *See Bennett,* 653 S.W.3d at 371–72. At no point was the debtor deprived of his free will, and "[the] party seeking to set aside the deed on the ground of undue influence must show that he was 'deprived of his free will . . . with proof that is clear, cogent, and convincing.'" *Black* v.

15

*Duffie*, 508 S.W.3d 40, 50 (Ark. Ct. App. 2016) (quoting *Hooten*, 227 S.W.3d at 435); *see also Hankins v. Austin*, 425 S.W.3d 8, 16 (Ark. Ct. App. 2012).

There is also insufficient evidence that the debtor transferred his interest in the Elkins Property to Hernandez because he feared her or she coerced him. There was evidence suggesting that the debtor may have harbored, or at some point developed, romantic feelings for Hernandez, as he eventually declared such feelings in a letter, but the record is very clear that Hernandez never led him to believe those feelings were or ever would be reciprocated. The debtor also testified that Hernandez leveraged her friendship with him, but it is unclear specifically how. He did not testify that she made threats to terminate the friendship; he testified only that she would be upset if he cancelled the contract to purchase the Elkins Property. The debtor's decisions may have been influenced by a desire to avoid upsetting Hernandez, but that is not the type of influence that permits the law to intervene and fix regrettable actions. In addition, his decision to gift her the house was not out of his character, as the Elkins Property was the second house he had purchased for someone in less than one year, and Hernandez had nothing to do with the first one.

Further, the debtor's credibility is suspect. As noted throughout this Order, certain evidence presented at trial contradicted the debtor's deposition testimony. For example, he testified at his deposition that Hernandez brought the deed to his house, and he executed it while crying without a notary. (Eastburn Dep. 42.) The evidence at trial was to the contrary: Hernandez and the debtor drove separately to a UPS store, where the debtor executed the deed in the presence of a notary. And, the deed, in fact, bears a notary's signature. After that fact was brought to Eastburn's attention and he was again questioned about the circumstances of the deed signing, he stated, "[l]ike I said, I have no recollection." (Eastburn Dep. 42-43.) While the debtor was confused about the circumstances of the signing of the deed, Hernandez was not and her testimony was consistent and credible. Further, the debtor's text messages with Hernandez do not suggest that the debtor had any misgivings or confusion about the deed and indicate that he was in his right mind and not distressed about executing the deed.

16

Also, the debtor was not without assistance.  The debtor had an attorney—Kelley—who had represented him for years, who set up his trust for him, whose advice he could have sought regarding the quitclaim deed, and whose advice he apparently did seek when he decided to request that Hernandez sign a note and mortgage a couple of months prior to his bankruptcy filing.  And, when Kelley contacted Hernandez concerning the proposed note and mortgage in 2023, the record does not show that she raised any issues to Hernandez about the debtor's mental capacity or alleged that Hernandez had exerted any undue influence over him to obtain the Elkins Property.

In sum, the debtor was not unduly influenced by Hernandez.  The debtor, like most people, naturally wanted, sought, and received, the benefits of friendship.  In fact, the debtor and Hernandez were in an actual friendship, and it was within the context of this friendship that he gifted Hernandez a house.  While this is not a normal gift for most people, Hernandez testified she considered the debtor to be a financially savvy business person.  There was simply no evidence that Hernandez forced his hand to obtain a free house; the text messages show that the debtor was an enthusiastic participant in his own plan.  Hernandez accepted the gift, and she continued to be his friend, until the debtor decided to alter the friendship.  Any influence sprung out of his affection for his friend, and the Court finds there was no undue influence placed on the debtor by Hernandez. Therefore, this cause of action also fails.

### B. There was No Mutual Mistake

The Court previously denied summary judgment on this issue. Because there was no additional evidence or argument at trial that affected its prior analysis, the Court's conclusions in its Summary Judgment Order remain the same.

"A mutual mistake must be shown by clear and decisive evidence that, at the time the agreement was reduced to writing, both parties intended their written agreement to say one thing and, by mistake, it expressed something different." *Statler v. Painter*, 133 S.W.3d 425, 428 (Ark. Ct. App. 2003) (citations omitted). "Whether a mutual mistake . . . occurred is a question of fact." *Id.*  "[A]n allegation of mutual mistake necessarily requires evidence that the parties' intent differ[ed] from the written instrument[.]" *Stalter v. Gibson,* 379 S.W.3d 710, 715 (Ark. Ct. App. 2010).

17

As stated in its Summary Judgment Order, the quitclaim deed did not express something different than what the parties' intended.  To the contrary, the deed expressed the parties' intent to put the property in Hernandez's name, irrespective of whether the debtor later regretted giving up his interest in the property or whether he actually expected payments.  Hernandez contacted Reynolds to draft the deed so that she would not have to fight the debtor's son to keep the home if something happened to the debtor, and the debtor signed the deed intending to protect Hernandez by ensuring that she kept the home in the event of his death.  Although the parties later realized that the quitclaim deed was unnecessary due to the wording of the original deed, the quitclaim deed itself stated what the parties meant for it to state.

### C.  Hernandez Was Not Unjustly Enriched

The trustee alleges that Hernandez was unjustly enriched because of the transfer of the debtor's half interest in the Elkins Property.  A "tortious or fraudulent act is not required to create a basis for an unjust-enrichment claim." *Trickett v. Spann*, 613 S.W.3d 773, 779 (Ark. Ct. App. 2020) (citing *Frigillana v. Frigillana*, 584 S.W.2d 30 (Ark. 1979)).  "Even an innocent defendant is subject to an unjust-enrichment claim brought by a more deserving party." *Id.*  (citing *Malone v. Hines*, 822 S.W.2d 394 (Ark. Ct. App. 1992)).

Certainly, Hernandez received something of value for which she did not pay, and she was enriched.  However, to find *unjust* enrichment, "a party must have received something of value to which he or she is not entitled and which he or she must restore." *Trickett*, 613 S.W.3d at 779 (citing *Hatchell v. Wren*, 211 S.W.3d 516 (Ark. 2005) and *Rigsby v. Rigsby*, 149 S.W.3d 318 (Ark. 2004)).  "One who is free from fault cannot be held to be unjustly enriched merely because he or she has chosen to exercise a legal or contractual right." *Id.* at 777.  It is here where the trustee's claim for unjust enrichment fails.

Hernandez accepted a gift from a close friend, which gift she was entitled to accept.  While the debtor claims there was a payment arrangement that Hernandez had agreed to, the debtor could not produce the agreement because he had destroyed it.  (Eastburn Dep. 34.)  Hernandez disputed there was an agreement for her to pay the debtor for the home and the weight of the evidence supports her testimony in this regard—there is no supporting promissory note, mortgage, payment, or text message to corroborate the

18

debtor's alleged expectation of payment prior to the August 2021 documents the debtor later retracted.

There is no operative fact, no intent, or action on Hernandez's part that makes it unfair for her to retain the gift; in fact, Hernandez and the debtor remained friends after the conveyance.  The debtor testified that, after Hernandez and her family moved into the Elkins Property, they all went canoeing, out to eat, would hang out, by the pool in the backyard, and that he would eat dinner there "most of the time, and that Hernanez was welcoming during this time." (Eastburn Dep. 20.)  It is true that later in the same deposition, the debtor offered somewhat contradictory testimony—that after they moved into the Elkins Property, Hernandez was "more distant and much more [sic] less communicative. . . .  She wouldn't reply to messages.  And I certainly didn't bombard her with them, but just messages that you send friends. . . .  I just gave up trying to get her to answer her phone." (Eastburn Dep. 40.)   However, if the debtor was eating dinner with her and her family most of time, this suggests there was regular communication.  And, the ultimate failure of a relationship is not enough on which to base an unjust enrichment claim.  *See Feagin v. Jackson*, 419 S.W.3d 29, 33–34 (Ark. Ct. App. 2012) (affirming trial court's finding that there was no unjust enrichment in allowing defendant to retain half of proceeds from sale of home after romantic relationship with plaintiff failed.).

While a broad outline of facts in this case certainly required further scrutiny, after applying the applicable law to the facts in the record, there is no basis to set aside the quitclaim deed for the transfer of the Elkins Property to Hernandez.

### V. Conclusion

For the above-stated reasons, the Court finds that no basis upon which to set aside the July 20, 2021 quitclaim deed.  Therefore, the Court denies the relief sought by the trustee.


IT IS SO ORDERED.

Honorable Bianca M. Rucker
United States Bankruptcy Judge
Dated: 05/15/2026

19

cc:     J. Brian Ferguson, chapter 7 trustee
James R. Baxter, attorney for J. Brian Ferguson
Vanessa Cash Adams, attorney for Kira Hernandez
Anh-Thu Cecille Doan, attorney for Kira Hernandez
United States Trustee